CONSERVATIVE LIFE INS. CO. *v.* BOLLINGER.

(Decided May 13, 1935.)

*Mr. Frederick W. Gaines,* for plaintiff in error.
*Mr. Joseph O. Eppstein* and *Messrs. Okun & Friedman,* for defendant in error.

CARPENTER, J.   January 31, 1922, the Conservative Life Insurance Company issued to Charles Willis Bollinger a contract of life insurance in the amount of $1,000, in the form it called a "multiform policy." It started as a five-year term contract, with an option to the insured at the end of the term to convert it into one of various other forms of insurance, and at the expiration of that term, on January 31, 1927, the insured did elect to continue it as an *ordinary whole* life contract at the premium stipulated in the policy.

He also chose to pay the premiums on the quarterly basis, which was also authorized by the policy, and such premiums were duly paid to April 31, 1932.

The installment of premium due July 31, 1932, was not paid, and the insured was accidentally killed September 2, 1932. The beneficiary named in the policy, the wife of the insured, Adah Bollinger, defendant in error herein, filed a petition in the Common Pleas Court asking judgment for the amount of the policy, $1,000. She alleged, in substance, that the insured had complied with the terms and conditions of the policy, and that it "was in full force and effect" at the time of his death.

The answer admitted the issuance of the policy, but denied generally the other allegations of the petition, and specifically stated that the policy lapsed for nonpayment of premium July 31, 1932, and that the insured in his lifetime elected to accept the cash value of the contract according to its terms, and that defendant tendered to the beneficiary the amount of such surrender value, $100.

These allegations were denied in the reply. The trial court found for the plaintiff and gave her judgment for $1,000 and interest. The company prosecutes this error proceeding.

The policy was in most respects in the usual form of life insurance contracts. Some provisions of it are material to the determination of the issues here presented. On the face of the instrument appears this language:

"A grace of one month from the date when it would otherwise be payable will be granted for the payment of each premium after the first, during which time this policy shall remain in full force."

Under the heading *"Guaranteed Surrender Values"* this appears:

"After this policy has been in force one full year,

the owner, within one month after any default, may elect (a) to accept the value of this policy in cash, or (b) to have the insurance continued in force from date of default without the right to loans, for its face amount, less any indebtedness to the Company hereon, or (c) to purchase non-participating paid-up insurance payable at the same time and on the same condition as this policy. * * *

"If the owner shall not within one month from default surrender this policy to the Company at its Home office for a cash surrender value or for paid-up insurance as provided in options (a) and (c) the insurance will be continued as provided in option (b)."

Then follows a "table of guaranteed values under the condition specified herein" which shows as follows: At the end of fifth year, "Cash or loan," $100; "Paid-up," $176; "Extension," 5 years, 135 days.

Then follows under the title *"Loans"*:

"After this policy has been in force one full year, the Company at any time, while this policy is in force, will advance, on proper assignment of this policy and on the sole security thereof * * * a sum equal to * * * the reserve * * *."

The policy also provides that from such loans may be deducted the unpaid balance of the current year premium, and interest in advance to the end of that year.

May 26, 1932, the insured wrote the company asking "how much I can cash my policy in for." To this the company replied that the surrender value could not be applied for before July 31, 1932, and then only within thirty days after that date.

June 24, 1932, he wrote: "As you say, there is a clause in the policy in regards to a cash-in value, but I find no clause which says I cannot get a loan on this policy, therefore please send me an application to

make a loan and please state if I can get $100 net by July 25, 1932." The record does not disclose the answer of the company to this letter, but July 27, 1932, the insured wrote:

"My insurance will be due July 31, 1932, on policy # 37983. I have no money and wish to cash in, anyway I can get the most out of it, so please send me the application blank."

The reply was that "if the cash surrender value is applied for, this must be considered as a new application and taken in its proper turn. However, as we previously advised, the request for loan has been entered on our records and blanks will be forwarded in their turn at the earliest possible date."

August 4, 1932, insured again wrote:

"I have your letter of June 24th stating you have entered my application for a loan on Policy # 37983 and your letter of Aug. 2nd regarding cash surrender value, which would apply on your books as a new application. If the cash surrender and loan value are the same, it don't make any difference but if the cash surrender value is the largest, that is what I want.

"I haven't had any work for over one year, and I begin to need money bad, so please do the best you can about getting it through for me. The cash value for five years being $100.00 and $122.00 for six years, as I have paid 5½ years, it looks to me as I would be entitled to $111.00 net.

"Do the best you can and thanks."

Under date of August 31, 1932, the company wrote the insured as follows:

"As requested, we enclose blanks showing the full loan value under the above numbered policy, at the present time, less quarterly premium due July 31, 1932, and less interest on loan from date thereof to one month beyond the next anniversary date of the policy. At that time, interest at the rate of 6% will become payable annually in advance.

"We wish to advise that this loan may be paid off in partial payments, to suit your convenience and any unearned interest on payments will, of course, be refunded.

"Kindly have blanks properly executed and returned to this office together with policy contract, which is to be held as collateral security, at which time the matter will have our attention.

"P. S. When executing these papers, be sure to sign your name exactly as it appears thereon (Charles Willis Bollinger). It is also necessary that name of beneficiary be signed exactly as it appears on our records (Adah Bollinger)."

Accompanying this letter was a formal, filled-out blank application for a loan on the policy, and by it the "quarterly premium due July 31, 1932, $9.40," and "interest on loan to February 28th, 1933, $2.95," were deducted from the $100 loan value, leaving a balance of $87.65 which would have been available to the insured on the loan application.

On the back of that letter, on September 1, 1932, the day before insured was killed, the insured wrote a letter as follows:

"I don't care to accept this loan for $87.65 you are making the loan on 5 years premiums and want me to pay six years premiums. I will cash the policy in for $100.00 net and no less. You remember some time ago I told you I wanted to get the most out of the policy. So please send papers to cash in, in place of loan papers."

The contract between the company and the insured was expressed in the whole policy. It contained an option to him on default in payment of premiums to take one of three different settlements, as set forth above, provided he did so within the "one month" of grace. If he failed to exercise his option, the terms of the contract, item (b), automatically operated to extend his insurance for the full amount for the term

indicated in the table, which at five years was for 5 years and 135 days.

If, within the time specified, Bollinger exercised that option to take the cash value, $100, item (a), a new contract took the place of the original policy contract.

Counsel for the company presented a very persuasive argument to the court and filed a very complete brief in support of his client's claim that the letters of the insured, particularly that of August 4, 1932, quoted above, operated as a complete exercise by insured of the option to take the surrender value of his policy, $100, and that now that is all that is due from the company under this contract. The record shows that a check for the $100 was promptly tendered the plaintiff herein on receipt of information by the company of the death of Mr. Bollinger, and that it was refused by her.

Plaintiff contends that the letters between the parties to the contract did not evidence a definite exercise on the part of Bollinger of any option, and, even if they did, exercise of the option was not completed by the surrender of the policy, as required by its terms. From our examination of the correspondence to and including the insured's letter of August 4, 1932, we are not able to say he did intend a definite and final election of the surrender value option. Manifestly the company did not so regard it, for August 31, 1932, it wrote him the letter set forth above, and with it sent an application for the loan. This was on the last day assured had to exercise an option. In view of the facts that insured lived in and wrote his letters from Toledo, Ohio, and the company's office was at Wheeling, West Virginia, his letter of August 4th must have been in the company's hands when it wrote its letter of August 31st. The option in the policy was a standing offer to the insured, and to

create a new contract under it he had to accept it precisely with its terms. 9 Ohio Jurisprudence, 262.

Bollinger's letter of September 1st was clear and unequivocal, but it was too late; his time for exercise of the option, "one month" from July 31, 1932, had passed. No longer had he the absolute right to change his contractual relations with the company without its consent; and before that consent could be given he was dead. September 3, 1932, the company wrote acknowledging receipt of his request for cash, and said: "blanks for this purpose will be forwarded at the earliest possible date." This was the next day after his death.

In view of the conclusion we have reached that Bollinger did not by his letters exercise the option to take either cash or loan on his policy within the time prescribed in it, it follows that the insurance was automatically extended and was in full force on his death.

To decide the issues here we do not find it necessary to determine whether the policy had to be physically surrendered or delivered to the company to effect a complete exercise of the option in question, and we express no opinion on that issue.

It follows that the judgment of the trial court must be affirmed.

*Judgment affirmed.*

LLOYD and OVERMYER, JJ., concur.